UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PARIS ARNOLD, | ) | |
| | ) | |
| Petitioner, | ) | 14 C 8501 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| JEFF HUTCHINSON, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Paris Arnold, a state prisoner, petitions for a writ of habeas corpus under 28 U.S.C.

§ 2254. Doc. 14. On Arnold's motion shortly after counsel appeared on his behalf, the court

stayed the case to allow him to obtain the contents of a newly discovered police file. Doc. 17.

After receiving and reviewing the file, Arnold voluntarily dismissed two claims, and the stay was

lifted. Doc. 19. The remaining claims assert that Arnold's attorneys were ineffective in several

respects, in violation of the Sixth Amendment, and that key evidence at trial was the fruit of an

arrest made without probable cause, in violation of the Fourth Amendment. Doc. 14 at 8-9. The

habeas petition is denied, and a certificate of appealability will not issue.

### Background

A federal habeas court presumes that the state courts' factual findings are correct unless

they are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v.

Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only

if it ignores the clear and convincing weight of the evidence.") (internal quotation marks

omitted); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012) ("We give great deference to

state court factual findings. After AEDPA, we are required to presume a state court's account of

the facts correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.") (internal quotation marks omitted). The state trial court's 2011 dismissal of Arnold's post-conviction petitions was the state courts' final word on the merits of Arnold's ineffective assistance claims. Doc. 30-16 at 115-20. The Appellate Court of Illinois was the last state court to address the merits of Arnold's Fourth Amendment claim, *People v. Arnold*, 812 N.E.2d 696 (Ill. App. 2004) (reproduced at Doc. 30-1), and also the last to have described the facts and procedural history of the case, *ibid.*; *People v. Arnold*, 2013 IL App (1st) 112039-U, 2013 WL 4106449 (Ill. App. Aug. 13, 2013) (reproduced at Doc. 30-7). The following sets forth the facts as the state courts described them and as the transcripts reflect, as well as the procedural background of the state criminal and post-conviction proceedings.

### A.     Factual Background

On the evening of April 2, 2001, Karen Goodwin was found shot to death in a car in a parking lot at 1350 West 14th Street in Chicago. 812 N.E.2d at 698. Her murder remained unsolved months later when, on July 26, Detective James Sanchez arrested Tony Robinson in connection with an unrelated murder, and Robinson told Sanchez that he knew who killed Goodwin. *Id.* at 699; Doc. 30-17 at 81-84. Robinson was interviewed that day by Sanchez, and then several more times over the following days by other detectives, including Gregory Swiderek and William Sorengen. 812 N.E.2d at 698-700; Doc. 30-17 at 48, 81-82.

Initially, Robinson identified three men as Goodwin's attackers: Gregory Brown (also known as "Ya-Ya"), Antoine Truitt (also known as "Twan"), and a person he knew only as "Boo" (later identified as Maurice Brown, Gregory's brother). 812 N.E.2d at 698-99; Doc. 30-17 at 48, 57, 83-84; Doc. 30-18 at 63-64. (The court will refer to Gregory Brown as "Brown" and Maurice Brown as "Boo.") Robinson described the night Goodwin died as follows.

Robinson was standing with Brown in the lobby of 1410 West 14th Street when they saw a blue Chevy drive by. 812 N.E.2d at 698. They recognized the car as belonging to Maurice Lebon (also known as "Reese"), who owed Brown money. *Id*. at 698-99; Doc. 30-17 at 37-38; Doc. 30-18 at 62. Brown suggested to Robinson that they "get" Lebon—that is, shoot him—but Robinson declined. 812 N.E.2d at 698-99. Robinson and Brown went upstairs, where they encountered Boo and Truitt. *Id*. at 699. Brown asked Boo and Truitt if they wanted to "whack" Lebon. *Ibid*. Brown, Boo, and Truitt then parted ways with Robinson, who went to another part of the building to use cocaine. *Ibid*.; Doc. 30-17 at 39. About ten minutes later, Robinson saw Brown, Boo, and Truitt back in the lobby. 812 N.E.2d at 699. All three wore dark clothing and carried guns. *Ibid*. Brown's gun was a chrome .25-caliber semiautomatic pistol. *Ibid*.

Robinson went back upstairs. *Ibid*. Looking out through a window, he saw the three men head toward a parking lot just to the east, near some row houses. *Ibid*. The blue Chevy was in the parking lot. *Ibid*. Robinson watched Brown approach the parking lot from the south and Boo and Truitt approach it from the north. *Ibid*. Then Robinson heard gunshots. *Ibid*. Shortly thereafter, Brown came back and told Robinson, "I just whacked that n-----." *Ibid*. Brown added that he had put his gun in a garbage can by an incinerator. *Ibid*. Robinson later learned that it was Goodwin, not Lebon, who was killed inside the Chevy. *Ibid*.

Robinson's account was consistent with several details that the police's own investigation had turned up: Robinson correctly described the car and the parking lot in which Goodwin's body was found; forensic analysis corroborated his assertion that there were three assailants, each with a gun, one of which was a .25; eyewitnesses who saw the attackers flee agreed that they wore dark clothing; and the .25 used in the shooting was, in fact, discovered in a nearby trash can. Doc. 30-17 at 43-46. But the detectives were skeptical that Robinson was telling the

whole truth, in part because Truitt was dead (having been shot to death weeks after Goodwin's murder) by the time Robinson spoke to Sanchez, and in part because Sanchez waffled over the shooters' identities after expressing fear that his family would be harmed if he identified them. 812 N.E.2d at 699 & n.2; Doc. 30-17 at 49-50, 52-54, 82.

Robinson adhered to versions of this account through several additional interviews between July 26 and 29, but he continued to tell detectives that he feared gang retaliation and was not being "entirely truthful." 812 N.E.2d at 699-700. Then, in a July 30 interview with Swiderek and Sorengen, Robinson changed a crucial detail: he said that Arnold, not Truitt, was the third shooter. *Id*. at 699; Doc. 30-17 at 41. Robinson was initially reluctant to name Arnold, he explained, "because he knew [Arnold] was a 'general' in the New Breed Street gang." 812 N.E.2d at 699; *see also* Doc. 30-17 at 41. Robinson maintained that the rest of his account was truthful. 812 N.E.2d at 699; Doc. 30-17 at 42.

This new version was more convincing to the detectives. After Robinson implicated Arnold, police showed Robinson a photographic lineup, from which he identified Brown, Boo, and Arnold as the shooters. 812 N.E.2d at 699. Based on this identification and without first obtaining a warrant, the police arrested Arnold at 3:30 p.m. that afternoon. *Ibid*.

Arnold was taken to the police station and held there for several hours. Doc. 30-17 at 33. Sanchez was the first officer to interview him, at approximately 8:00 p.m. that evening. *Id*. at 106. The interview was not transcribed, and only Sanchez and Arnold were present, though it is undisputed that Sanchez read Arnold his *Miranda* rights. *Id*. at 106-07, 110; Doc. 30-18 at 66-67. According to Sanchez, that first interview lasted about twenty minutes, during which time Arnold orally confessed to participating in the Goodwin shooting along with Brown and a third individual, Cornelius Robinson (also known as "Pig"). Doc. 30-17 at 107; Doc 30-18 at 52. (To

avoid confusion with Tony Robinson, the court will refer to Cornelius Robinson as "Pig.") Later that evening, around 10:00 p.m., assistant state's attorney Mari Rose McManus joined the interview, and Arnold repeated his oral confession to her and Sanchez. Doc. 30-17 at 108-09; Doc. 30-18 at 141. The next afternoon, July 31, two other detectives, George Vasilopoulos and John Pelligrini, re-read Arnold his *Miranda* rights, and again Arnold orally confessed. Doc. 30-17 at 115-16. Finally, at 11:30 p.m. on July 31, McManus and Pelligrini re-Mirandized and re-interviewed Arnold, who again confessed; this time, McManus and Pelligrini recorded Arnold's confession in a handwritten statement, which he signed. *Id*. at 122-25.

Arnold's written confession was similar to Robinson's account. In it, Arnold described meeting Brown, who was looking for Lebon because Lebon owed him money. Doc. 30-18 at 155. Arnold described Lebon's blue Chevy passing, and said Brown stated that he was "going to kill this n-----." *Id*. at 156. Arnold said there were three shooters—himself, Brown, and Pig— each with his own gun. *Id*. at 155-57. Arnold said that he approached the parked car from one direction with Pig, with both firing shots at the car, while Brown approached from another direction, firing directly into the passenger seat. *Id*. at 157-58. Arnold, Brown, and Pig then went to a nearby playground, where Brown stashed his gun—"a smaller caliber gun, a 22 or a 25"—in a garbage can. *Id*. at 158. Arnold and Brown then returned to 1410 West 14th Street. *Id*. at 159. The written statement acknowledges that Arnold heard and waived his *Miranda* rights, was treated well in custody, and gave the statement voluntarily. *Id*. at 154, 159-60.

### B. Pretrial Proceedings

Before trial, Arnold moved to suppress his confessions as the product of an unlawful arrest without probable cause. Doc. 30-14 at 56-57. At the hearing, the prosecution relied on Robinson's statement implicating Arnold in the Goodwin shooting as one basis for probable

cause, and also relied on the statement of another arrestee, Marcus Hunter, who said he saw Arnold shoot Truitt (whom Robinson had initially identified as one of the three attackers) three weeks after Goodwin's murder. Doc. 30-17 at 94-97. The prosecution introduced Robinson's statements through Detective Swiderek, who described his interviews with Robinson on July 27 (when Robinson implicated Truitt in Goodwin's murder) and on July 30 (when he implicated Arnold). *Id*. at 36-43. The prosecution argued that details of Robinson's statements were corroborated by the detectives' own investigation, giving rise to probable cause. *Id*. at 93-96.

Arnold's counsel, Gina Piemonte, attacked Robinson's credibility, noting that he was in custody on suspicion of a different murder; that he changed his story about Goodwin's murder several times, most notably on the crucial detail of whether Truitt or Arnold was involved; and that he might himself have been involved in that murder. *Id*. at 97-99. Piemonte also argued that Hunter, too, was not a credible enough informant for his accusation to supply probable cause. *Id*. at 99-101. The judge denied the motion to suppress, finding "ample, overwhelming" probable cause to believe that Arnold was involved in Goodwin's murder. *Id*. at 101-02. The judge also concluded that police independently "may have had probable cause" to believe Arnold shot Truitt, even though they did not arrest Arnold right away after interviewing Hunter. *Id*. at 102.

In the alternative, Arnold moved to suppress his confessions on the ground that they had been coerced with threats of violence. Doc. 30-14 at 58-60. The detectives denied his allegations. Doc. 30-17 at 107-08, 117, 124. Because the interviews were not recorded, it was Arnold's word against the detectives', and the judge, finding that Arnold's testimony was not credible and that the confessions were voluntary, denied the motion. *Id*. at 135.

Just before trial, Arnold moved *in limine* to bar any evidence of his prior bad acts or alleged gang affiliations. Doc. 30-14 at 68-69. The motion argued that mentioning Robinson's

assertion that Arnold was a high-ranking gang member "would be highly prejudicial" and that Arnold's alleged gang membership had "no probative value to the case." *Id*. at 68. The judge granted the motion. Doc. 30-18 at 5.

### C. Trial and Sentencing

Arnold opted for a bench trial. *Id*. at 4. The judge who presided, Colleen McSweeney-Moore, was the same judge who conducted the suppression hearings and ruled on the motion *in limine*. Doc. 30-17 at 29; Doc. 30-18 at 2.

In its opening statement, the prosecution asserted that it would rely principally on Arnold's confessions, backed up by "sufficient corroboration" from other evidence. Doc. 30-18 at 8-9. In his testimony, Sanchez described Arnold's initial confession on July 30, for which only he and Arnold were present. *Id*. at 49-53. Sanchez added that Arnold's oral statement (consistent with the later, written confession) identified Arnold, Brown, and Pig as the three shooters and their respective guns—a .380 for Arnold, a .32 for Pig, and a .25 for Brown—and described Brown as the person who shot Goodwin. *Id*. at 52-53. Sanchez testified that Arnold gave a more detailed version of the same statement to McManus later that evening. *Id*. at 54.

On cross-examination, Piemonte raised Sanchez's prior conversation with Robinson on July 26. *Id*. at 56. The prosecution objected, arguing that Arnold's pretrial motion *in limine* precluded the parties from introducing "any information regarding Tony Robinson." *Ibid*. Piemonte responded that her motion sought to exclude only evidence of Arnold's gang affiliation, and that cross-examining Sanchez about the prior interview with Robinson was necessary to establish Sanchez's "state of mind of the knowledge he possessed prior to going in and interviewing my client on the 30th." *Id*. at 57. Piemonte explained that she wished to establish what Sanchez had previously heard from Robinson regarding the Goodwin murder, in

order to "show the details that this officer knew"; she was not, she explained, offering Robinson's statements for their truth. *Ibid*. The judge accepted that argument, but with a caveat: questioning Sanchez about Robinson would make it "relevant why Robinson changed his mind," meaning the questioning would open the door for the prosecution to ask about Robinson's gang-involvement accusations on re-direct. *Id*. at 59-60. Piemonte responded, "I would like to go into this area, because I believe that I need to." *Id*. at 59. The judge then overruled the objection, while noting that Piemonte was "violating [her] own motion in limine" and would "proceed at [her] own peril." *Id*. at 60.

Piemonte then cross-examined Sanchez regarding the Robinson interview, establishing that Robinson's July 26 statement included the following details: (1) Lebon owed Brown money; (2) three people were involved in Goodwin's shooting; (3) it was Brown who actually shot Goodwin; (4) Brown brought a .25 caliber handgun to the shooting and discarded it in a trash can afterward; and (5) the three shooters returned to 1410 West 14th Street after the attack. *Id*. at 62-63. Piemonte also established that Sanchez was previously aware that both .25 and .380 caliber bullet casings were found at the crime scene. *Id*. at 69. Finally, as to Sanchez's initial interview with Arnold on July 30, Piemonte established that Sanchez was the only person present for that interview, *id*. at 66, that no other witnesses could corroborate what transpired during that interview, *id*. at 66-67, and that Sanchez nowhere documented the questions he asked Arnold during the interview, *id*. at 68.

On re-direct examination, the prosecution did not ask Sanchez about Arnold's purported gang affiliation. *Id*. at 68-69. It simply clarified that Robinson's account differed from Arnold's, in that Arnold supposedly claimed that Pig was a shooter while Robinson named Boo, and that Robinson did not tell Sanchez the caliber of Arnold's or Boo's guns. *Ibid*.

Later, Vasilopoulos testified about his and Pelligrini's interview with Arnold on July 31, *id*. at 129-34, and McManus testified about Arnold's statements to her later that night, when she recorded his confession in writing, *id*. at 148-63. Other prosecution witnesses included a bystander, who was nearby when the shooting occurred, and forensic analysts, who testified about the bullets and other evidence found at the crime scene. *Id*. at 14-23, 70-124. Arnold opted not to testify or put on any evidence. *Id*. at 184-85.

In its closing argument, the prosecution relied primarily on Arnold's written statement, *id*. at 185-88, arguing that it was "backed up by the firearms evidence." *Id*. at 187. In response, Piemonte pressed two distinct arguments, both geared toward casting doubt on the validity of Arnold's confessions—which she stressed were "the only evidence" linking him to the crime. *Id*. at 188-89. First, Piemonte pushed back against the assertion that Arnold's confessions were "corroborated by the physical evidence and therefore are reliable," *id*. at 189, offering various discrepancies between Arnold's written statement and other evidence as further reason to doubt the confessions' validity, *id*. at 193-96. Second, she argued that the circumstances under which the detectives obtained the confessions were "suspicious" and "questionable," which—combined with the fact that "there's nothing in this statement that the police didn't already know"—created reasonable doubt about the confessions' authenticity. *Id*. at 190-91, 196. Specifically, Piemonte argued that Robinson's statements gave Sanchez full knowledge of how the shooting went down before he interviewed Arnold on July 30. *Id*. at 189-90. Piemonte then argued that the subsequent interviews were suspect, specifically emphasizing Sanchez's continued involvement. *Id*. at 191-92 ("We have a state's attorney called in, and she goes in and interviews Mr. Arnold no less than three occasions at all times with, guess who? Detective Sanchez ….").

The judge found Arnold guilty, concluding that his confessions were sufficient to convict because they were "overwhelmingly substantiated by the physical evidence." *Id*. at 206. The judge sentenced Arnold to forty-five years in prison—twenty-five years for the murder, plus a twenty-year enhancement for personally discharging a firearm. *Id*. at 215.

### D.    Post-Trial Proceedings

On direct appeal, Arnold contended that the judge erred in finding that his arrest was supported by probable cause and that his twenty-year enhancement violated the Illinois and United States constitutions. 812 N.E.2d at 700-01, 704. The Appellate Court of Illinois rejected his claims. *Id*. at 701, 704. Both the Supreme Court of Illinois and United States Supreme Court denied review. *Arnold v. Illinois*, 547 U.S. 1075 (2006); *People v. Arnold*, 844 N.E.2d 40 (Ill. 2005).

The procedural history of Arnold's state post-conviction litigation is complex, but the minutiae do not matter for present purposes. Arnold asserted various claims in multiple filings spanning several years, some of which he submitted *pro se* despite being represented by a public defender. 2013 WL 4106449, at *1-3 (Doc. 30-7 at 1-2). Specifically, Arnold claimed that: (1) prejudicial hearsay testimony concerning Robinson's statements should not have been admitted at the suppression hearing, and Piemonte was ineffective for failing to object, Doc. 30-12 at 25-27; (2) Piemonte was ineffective for eliciting hearsay testimony about Robinson's statements at trial, *id*. at 27; (3) the evidence obtained after his arrest should have been suppressed because more than forty-eight hours passed between his arrest and initial court appearance, and Piemonte was ineffective for failing to move to suppress on that ground, Doc. 30-13 at 58-59; and (4) Arnold's appellate counsel was ineffective for failing to raise Piemonte's ineffectiveness, Doc. 30-12 at 27; Doc. 30-13 at 58. Arnold also mounted various challenges to the twenty-year

sentencing enhancement and to the indictment, along with associated ineffectiveness claims. Doc. 30-12 at 28-30; Doc. 30-13 at 58-60; Doc. 30-21 at 9-12. None of those claims persuaded the trial court, which rejected them all, or even Arnold's post-conviction public defender, who took several years to review the case and eventually offered no response to the State's motion to dismiss. 2013 WL 4106449, at *2-4 (Doc. 30-7 at 1-3); Doc. 30-16 at 119-20. On appeal, the state appellate court determined that Arnold's post-conviction counsel had provided reasonable assistance and affirmed the trial court's dismissal of his claims, without reaching their merits. 2013 WL 4106449, at *7 (Doc. 30-7 at 5). The state supreme court denied review. *People v. Arnold*, 3 N.E.3d 796 (Ill. 2014).

Arnold then timely filed his federal habeas petition, Doc. 1, which he (now represented by counsel) amended with leave of this court, Docs. 7, 10, 14.

### Discussion

As things currently stand, Arnold presses the following claims: (1) his counsel was ineffective, in violation of the Sixth Amendment, in the following respects: (a) his trial counsel was ineffective for failing to object to Robinson's statements at the suppression hearing, Doc. 14 at 9; (b) his trial counsel was ineffective for eliciting Robinson's statements at trial, *ibid*.; (c) his trial counsel was ineffective for failing to move to suppress his statements on the ground that he was incarcerated for more than forty-eight hours without a probable cause hearing, *id*. at 8; (d) his appellate counsel was ineffective for failing to litigate the foregoing issues and/or trial counsel's ineffectiveness for failing to raise those issues, *id*. at 8-9; and (e) his post-conviction counsel was ineffective for failing to advocate any of Arnold's claims, *id*. at 10; and (2) Arnold's post-arrest statements should have been suppressed because he was arrested without probable cause in violation of the Fourth Amendment, *id*. at 7. Arnold's amended petition also claims that

11

his counsel was ineffective for failing to mount certain challenges to his indictment, *id*. at 8, but he "voluntarily dismissed" those claims in his reply brief, Doc. 37 at 23 n.7, so the court will not consider them.

The parties dispute whether Arnold procedurally defaulted his claims, Doc. 29 at 17-21; Doc. 37 at 4-10; Doc. 45 at 5-7; Doc. 51 at 8-10, and, if so, whether the court should excuse his default, Doc. 37 at 10-22; Doc. 45 at 7-11; Doc. 51 at 10-13. The parties have made extensive and nuanced arguments on these points. But the court need not, and therefore will not, resolve those complex procedural issues because, as the following discussion shows, Arnold's claims are resolved more readily on their merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Carrion v. Butler*, 835 F.3d 764, 772 (7th Cir. 2016) ("We need not address these potentially difficult procedural questions … because even if we were to decide each of them in [the petitioner]'s favor, his claims clearly fail on the merits."); *Ashburn v. Korte*, 761 F.3d 741, 750 (7th Cir. 2014) (holding that there was no need resolve a "close question" of procedural default where the petitioner's underlying ineffective assistance claim was meritless).

## I. Ineffective Assistance Claims

The state trial court's 2011 dismissal of Arnold's post-conviction petition was the state courts' final word on the merits of Arnold's ineffective assistance claims. Doc. 30-16 at 115-20; *see also* Doc. 29 at 22 (treating that ruling as the decision under review); Doc. 37 at 26-28 (same); Doc. 45 at 4-5 (same); Doc. 51 at 6 (same). The court therefore will review that decision under the standard codified in 28 U.S.C. § 2254(d). *See Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is

shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e] [Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1); … or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citation omitted); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *Gilbert v. McCulloch*, 776 F.3d 487, 492 (7th Cir. 2015).

Arnold argues that the state court unreasonably applied the ineffectiveness standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Doc. 37 at 22-23 & n.6. "[A] state court decision involves an 'unreasonable application of' federal law if the state court 'correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case.'" *Kamlager v. Pollard*, 715 F.3d 1010, 1015-16 (7th Cir. 2013) (second alteration in original). To obtain relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015). The "lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since a general standard from [the Supreme Court's] cases can supply such law," *Gilbert*, 776 F.3d at 491 (alteration in original) (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013)) (internal quotation marks omitted), but "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (internal quotation marks omitted).

The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. *See Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015). A defendant can establish that his attorney was ineffective only by showing both that (1) the attorney's performance was deficient and (2) he suffered prejudice as a result. *See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015).

For the first element, Arnold must show that his counsel's performance "'fell below an objective standard of reasonableness.'" *Blackmon v. Williams*, 823 F.3d 1088, 1102-03 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 688). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (quoting *Harrington*, 562 U.S. at 105) (internal quotation marks omitted). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight, and we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard*, 804 F.3d at 1225 (quoting *Strickland*, 466 U.S. at 689); *see also Woods*, 136 S. Ct. at 1151 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (internal quotation marks omitted). In dismissing Arnold's post-conviction petition, the state trial court ruled that his counsel's alleged errors were, in fact, "trial strategies," and that accordingly "[t]here is nothing here in this prong that … the attorney acted ineffective." Doc. 30-16 at 119. This court "must give AEDPA deference to that conclusion, upholding it so long as it is not objectively unreasonable." *Blackmon*, 823 F.3d at 1103. "When the claim at issue is one for ineffective assistance of counsel … AEDPA review is doubly deferential." *Woods*, 136 S. Ct. at 1151 (internal quotation marks omitted).

For the second element, prejudice, Arnold must show "a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016) (for *Strickland* prejudice, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome"). It is hard to glean from the state court's ruling a holding on the prejudice element. Doc. 30-16 at 119 ("There is nothing here in this prong that one, first of all, that attorney acted ineffective; and two, that that ineffectiveness would prevail."). This court therefore reviews *de novo* the prejudice element of Arnold's *Strickland* claim. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("In this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."); *Harris v. Thompson*, 698 F.3d 609, 625 (7th Cir. 2012) (noting that when state courts have adjudicated only one *Strickland* prong, "federal courts apply AEDPA deference to the prong the state courts reached but review the unaddressed prong *de novo*," and collecting cases).

### A.   Trial Counsel's Handling of Robinson's Statements at the Suppression Hearing

Arnold contends that Piemonte, at the suppression hearing, "failed to object to the hearsay statements Officer Swiderek made regarding Robinson" and "allowed Petitioner to be prejudicially portrayed as a gang member." Doc. 37 at 29. Despite Arnold's describing the statements as hearsay, the parties agree that he could not have properly objected to their admission at the suppression hearing on hearsay grounds. Doc. 29 at 23; Doc. 51 at 4. That is because Illinois law holds that "hearsay evidence is admissible during a hearing on a motion to suppress." *People v. Patterson*, 735 N.E.2d 616, 628 (Ill. 2000); *see also People v. LaBostrie*, 153 N.E.2d 570, 573 (Ill. 1958) ("It is also established that reasonable cause may be founded

upon evidence that would not be admissible at the trial. Specifically it has been held that reasonable cause may be founded upon hearsay evidence.") (citations omitted). Instead, Arnold asserts that Robinson's statements about Arnold's supposed gang membership should have been suppressed because they were "propensity" evidence that was "prejudicial and inflammatory." Doc. 37 at 29. This amounts to a claim that Piemonte should have objected under the evidentiary principles that have since been codified as Illinois Rule of Evidence 404 ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.") and Illinois Rule of Evidence 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of," among other things, "unfair prejudice" or "confusion of the issues.").

There are multiple flaws with Arnold's argument. First, just as hearsay was admissible at the suppression hearing, it is doubtful that those evidentiary principles could have been invoked at that hearing. In fact, Illinois Rules of Evidence 403 and 404 likely would not have applied in a suppression hearing. *See In re Kendale H.*, 3 N.E.3d 419, 427 (Ill. App. 2013) ("'In making its determination [about the admissibility of evidence], the court is not bound by the rules of evidence except those with respect to privileges.'") (alteration in original) (quoting Ill. R. Evid. 104(a) (eff. Jan. 1, 2011)). In *Patterson*, which established the admissibility of hearsay at suppression hearings, the Supreme Court of Illinois cited Federal Rule of Evidence 104(a), which also precludes objections at suppression hearings on the basis of any rule of evidence not pertaining to privileges—which includes Rules 403 and 404. 735 N.E.2d at 628 ("[F]ederal law supports defendant's argument. Federal Rule of Evidence 104(a) provides, in relevant part, 'Preliminary questions concerning … the admissibility of evidence shall be determined by the court …. *In making its determination it is not bound by the rules of evidence except those with*

*respect to privileges*.'") (alterations and emphasis in original); *see United States v. Ozuna*, 561 F.3d 728, 736 (7th Cir. 2009) (holding that the rules governing admissibility of expert testimony do not apply in suppression hearings because, under Federal Rule of Evidence 104(a), "the Rules of Evidence do not apply at pre-trial admissibility hearings"); *United States v. Bunnell*, 280 F.3d 46, 49 (1st Cir. 2002) (rejecting a Rule 403 challenge to evidence introduced at a suppression hearing because "[t]he Federal Rules of Evidence, apart from testimonial privileges, do not apply at suppression hearings"). Even though *Patterson* post-dates Arnold's suppression hearing, there is no reason to think that Illinois law was different at the time.

Second, even if the trial court might have entertained a Rule 403- or Rule 404-style objection, any such objection would have been futile. Proving Arnold's general penchant for criminality would have accomplished little at the suppression hearing, *see People v. Atwood*, 549 N.E.2d 1362, 1365 (Ill. App. 1990) (*"*[T]he question of whether defendant was a convicted felon had little bearing upon the question of whether probable cause existed for the issuance of the search warrant."), so there is little reason to think Robinson's statements were offered for that purpose. Rather, those statements had an important and permissible function: showing the information that the police had to link Arnold to the Goodwin murder before they arrested him, which bore directly on whether they had probable cause to suspect his involvement. That was the central question of the suppression hearing, and at the time of Arnold's arrest, Robinson's identification of Arnold as one of the shooters was *the* major piece of evidence linking him to Goodwin's murder. The statements' probative value therefore dwarfed whatever unfairly prejudicial effect they might have had. *See Bohannon v. Pegelow*, 652 F.2d 729, 734 (7th Cir. 1981) (admitting evidence that a litigant was previously the subject of a criminal investigation where it "was extremely probative (if not crucial)"); *People v. Howard*, 708 N.E.2d 1212, 1216

(Ill. App. 1999) (admitting potentially prejudicial past crimes evidence because it was probative of "the central issue"). Similarly, Robinson's assertion that Arnold belonged to a gang was essential to evaluating Robinson's credibility, because the purported gang affiliation was the only explanation Robinson gave to the police for the discrepancy between the account that implicated Arnold and the earlier accounts that implicated Truitt. *See United States v. Thompson*, 359 F.3d 470, 478 (7th Cir. 2004) (holding under Federal Rule of Evidence 403 that the district court properly admitted potentially prejudicial evidence that a key witness feared the defendant, where the witness's testimony had changed and the question whether to believe the witness's earlier account or the later one "was central to the jury's determination").

Arnold points to the trial court's later decision to grant his motion *in limine* to exclude statements about his supposed gang affiliation as proof that an objection to those statements at the suppression hearing would have been sustained. Doc. 37 at 31. But that conclusion does not follow. Although Robinson's identification of Arnold and his statement about Arnold's purported gang affiliation were centrally relevant at the suppression hearing, they had far less (if any) utility at Arnold's trial; there, unlike at the suppression hearing, the ultimate issue was Arnold's guilt or innocence, the rules of evidence applied with full force, and the key dispute was whether *Arnold's* confessions were reliable, not whether *Robinson's* earlier accusation was sufficiently trustworthy to support probable cause for Arnold's arrest. The judge's conclusion that Robinson's gang-related statements would be more prejudicial than probative at trial reveals next to nothing about how she would or should have resolved a similar objection at the suppression hearing. Instead, as already discussed, it is extremely likely that the judge would have overruled any such objection.

The upshot of all of this is clear: Arnold cannot establish that Piemonte's performance at the suppression hearing was deficient, much less that the state court unreasonably applied *Strickland* in concluding otherwise. A lawyer does not perform deficiently by failing to make an objection that would have been futile. *See Carter*, 796 F.3d at 735 (holding that "failing to make a futile objection" is not deficient performance); *Lambert v. McBride*, 365 F.3d 557, 563-64 (7th Cir. 2004) (same, where the state court "would have overruled" the proposed objection); *United States v. Neeley*, 189 F.3d 670, 684 (7th Cir. 1999) (same, where counsel did not object to "evidence that was properly admitted"); *United States v. Fish*, 34 F.3d 488, 495 (7th Cir. 1994) ("Where a motion for a continuance would prove futile, failure to seek one cannot constitute ineffective assistance."). For the same reason, Arnold has failed to show that he suffered any prejudice from his counsel's failure to object, *see McNary v. Lemke*, 708 F.3d 905, 921 (7th Cir. 2013) ("[I]f there was any error, there was no prejudice. Had counsel raised the issue, it still would have failed.")—even considering the issue *de novo*, as the court does here.

### B.  Trial Counsel's Handling of Robinson's Statements at Trial

As for Piemonte's performance at trial, Arnold challenges her decision to cross-examine Sanchez about Robinson's statements. Doc. 14 at 9; Doc. 37 at 28-29. That questioning, Arnold asserts, "elicited inflammatory, inadmissible hearsay testimony" and "opened the door" to prejudicial evidence of Arnold's alleged gang membership. Doc. 37 at 28. In Arnold's view, Piemonte had no reason to bring up Robinson, and her choice to do so was at cross purposes with her motion *in limine* to bar the prosecution from raising Arnold's supposed gang affiliation, meaning that the choice could not have been strategic. *Id*. at 25, 28-29.

"*Strickland* generally provides a presumption of strategic decision-making by counsel," *Mitchell v. Enloe*, 817 F.3d 532, 538-39 (7th Cir. 2016), and here the record confirms that

Piemonte acted strategically. Indeed, Arnold attacks what was not merely a *permissible* strategic choice by Piemonte, but—with the benefit of hindsight—what likely was a *correct* strategic choice. Piemonte faced a daunting challenge at trial: to persuade the judge that Arnold's confessions were not conclusive evidence of his guilt, despite the judge's earlier ruling that the confessions were voluntary. Accordingly, her trial strategy had two main goals, both focused on undermining the confessions' evidentiary force. First, she sought to highlight discrepancies between the details of Arnold's confessions and the other evidence. Second, likely anticipating the judge's ultimate conclusion that the confessions were "overwhelmingly substantiated by the physical evidence," Doc. 30-18 at 206, she sought to cast doubt on whether the details that *were* corroborated truly came from Arnold himself. Consistent with the latter goal, Piemonte's cross-examination of Sanchez sought to reveal how details of the crime could have found their way into Arnold's statement without his actually having participated in the shooting.

Cross-examining Sanchez was the best (if not the only) way for Piemonte to explain the corroborated details in Arnold's statement. Sanchez was the first detective to interview Arnold, he did so alone, and their conversation was unrecorded. By contrast, there were multiple prosecution witnesses to each of Arnold's subsequent interviews, and those witnesses said that Arnold repeated to them the same version of events he relayed at the initial interview with Sanchez—damning details included. Demonstrating that Sanchez had heard those crucial details before he interviewed Arnold gave Piemonte a fighting chance to argue that it was Sanchez's questioning, not Arnold's answers, that introduced corroborated details into Arnold's account. *Id*. at 202 ("[Prosecutor:] For you to believe that he didn't make this statement, I suppose you have to adopt some unsupported Defense theory that someone told him what to say …."); *see also* Brandon L. Garrett, "The Substance of False Confessions," 62 *Stan. L. Rev.* 1051, 1053

(2010) (describing the phenomenon of "confession contamination," in which police officers

"may, intentionally or not, prompt the suspect on how the crime happened so that the suspect can

then parrot back an accurate-sounding narrative"). The Sanchez interview, in other words,

represented the most vulnerable link in Arnold's chain of incriminating statements—but only if

Piemonte was willing to risk bringing Robinson back into the picture.

The transcript confirms that Piemonte had this strategy in mind. When the prosecution

objected to her bringing up Robinson, she told the judge the goal of her questions would be "to

show the details that this officer knew" and "the knowledge he possessed prior to going in and

interviewing my client." Doc. 30-18 at 57. After the judge allowed her to proceed, she elicited

from Sanchez several details that Robinson's July 26 statement had in common with Arnold's

later confessions. *Id*. at 62-63. When Vasilopoulos testified about his and Pelligrini's July 31

interview with Arnold, in which Arnold again confessed and included the same key details in his

account, *id*. at 131-34, Piemonte established on cross-examination that the interview took place

"after he had already been interviewed by Detective Sanchez." *Id*. at 137. Likewise, when

McManus (the assistant state's attorney) testified about Arnold's statements to her, *id*. at 143-63,

Piemonte asked whether Sanchez had spoken to Arnold alone before McManus arrived, *id*. at

163-64. And in her closing argument, Piemonte argued that Sanchez interviewed Arnold "armed

with" a litany of specific details about the crime, *id*. at 189-90, and that there was "nothing in

[Arnold's] statement that the police didn't already know before they questioned him," *id*. at 196.

So Piemonte adhered to her stated strategy, and she used the Robinson line of questioning (which

Arnold now challenges as baseless and irrational) to establish an essential predicate for

disregarding his confessions. *See Hinesley*, 837 F.3d at 733-34 (holding that the state court

reasonably rejected an ineffectiveness claim where defense counsel acted in a manner "[c]onsistent with his declared strategy" throughout trial).

Arnold also overstates the countervailing risks that Piemonte supposedly disregarded. First, the testimony elicited by Piemonte was not hearsay; as she explained to the judge, Robinson's statements were offered only to show Sanchez's "state of mind." Doc. 30-18 at 57-58. Second, there was little danger that the potential gang-affiliation testimony would prove prejudicial. Because nothing that Robinson told Sanchez was offered for its truth, the judge could not consider Robinson's statements as evidence of Arnold's guilt. And if Arnold's fear was that the judge would *impermissibly* hold Robinson's statements against him, that ship sailed when Arnold opted for a bench trial in front of the same judge who handled the suppression hearing and ruled on the motion *in limine*. Because the judge was fully aware of what Robinson said even before Piemonte cross-examined Sanchez, it was reasonable for Piemonte to take the risk that the judge might hear the same thing again. *See Hinesley*, 837 F.3d at 734 (holding that defense counsel's decision not to object to out-of-court statements at a bench trial was strategic and permissible, where the statements were already certain to be raised in some form and "*how* the statements were elicited ultimately would not have mattered much, if at all, to the factfinder"). As the Seventh Circuit has explained in the habeas context, "[i]n a bench trial, we presume that evidence admitted for a limited purpose is considered in its proper perspective by the trial judge." *Placek v. State of Ill.*, 546 F.2d 1298, 1305 (7th Cir. 1976); *see also Williams v. Illinois*, 132 S. Ct. 2221, 2235 (2012) ("[I]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.") (plurality opinion).

Finally, while it is true that the judge warned Piemonte that her proposed line of questioning might open the door for the prosecution to ask about Arnold's supposed gang

affiliation, Doc. 30-18 at 59, there was little reason for the prosecution to do so. Thanks in part to Piemonte's motion *in limine*, it was clear that gang affiliation could not be used as direct evidence of Arnold's guilt. If anything, testimony that the police believed Arnold to be a high-ranking gang member might have *weakened* the prosecution's case, by establishing a motive for detectives to pin on Arnold a shooting he did not commit. *Id*. at 197 (prosecution arguing in closing that the judge should reject Arnold's "theory that the police already knew this information" because there was no "motive for the police to make up something or put a case on the defendant"). Indeed, the prosecution did not ask Sanchez about Arnold's gang affiliation on re-direct, *id*. at 68-69, and the topic did not come up at any other point during the trial.

Whether to believe Arnold's confessions was the paramount question at trial. Piemonte's decision to ask about Robinson was the cornerstone of a strategy geared toward answering it in Arnold's favor. Although Piemonte's approach failed to convince the judge, the fact that her strategic choices did not result in an acquittal does not make her performance constitutionally ineffective. At the very least, the state court was not unreasonable in so holding. *See McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2013) ("In evaluating an attorney's performance, courts must defer to any strategic decision the lawyer made that falls within the wide range of reasonable professional assistance, even if that strategy was ultimately unsuccessful.") (internal quotation marks omitted); *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (same). That is true even if Arnold believes that a different approach would have been more prudent, because "there is no constitutional right to be represented by an attorney who shares the defendant's belief as to the best trial strategy." *United States v. Taylor*, 128 F.3d 1105, 1108 (7th Cir. 1997).

In any event, Arnold has even more clearly failed to show prejudice, because the risk to which Piemonte supposedly exposed him never came to pass. As noted, the prosecution at trial

introduced no evidence of Arnold's alleged gang affiliation, the alleged affiliation was never mentioned during closing argument, and the judge articulated a rationale for her verdict that made no reference to it. Doc. 30-18 at 185-206; *see Hinesley*, 837 F.3d at 735 (finding no prejudice where statements to which the petitioner believed his attorney should have objected during a bench trial "were not cited by the State in its closing argument, and were highly unlikely to have influenced the judge's assessment of guilt"). Arnold has thus failed to identify any way in which he was actually harmed by Piemonte's strategy.

### C. Trial Counsel's Failure to Move to Suppress Arnold's Confessions Due to a *Gerstein* Violation

Arnold next challenges Piemonte's failure to raise an additional possible ground for suppressing his confessions: the amount of time he was detained between his arrest and his initial probable cause determination. Doc. 14 at 8. Arnold argues that his confessions were made during a period of more than forty-eight hours that he was held without a probable cause determination, in violation of his Fourth Amendment rights under *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), and that Piemonte was ineffective in failing to move to suppress his confessions on that ground. Doc. 37 at 31-32; Doc. 51 at 5. Although, as noted below, a petitioner generally may not press Fourth Amendment claims on federal habeas review, a petitioner may present a Sixth Amendment argument that counsel was ineffective for failing to raise a Fourth Amendment issue in state court. *See Johnson v. Thurner*, 624 F.3d 786, 792-93 (7th Cir. 2010); *Ebert v. Gaetz*, 610 F.3d 404, 411-12 (7th Cir. 2010).

It may be that Arnold's *Gerstein* and *McLaughlin* rights were violated. *McLaughlin* held that a probable cause hearing held within forty-eight hours presumptively satisfies the Fourth Amendment, unless "the arrested individual can prove that his or her probable cause

determination was delayed unreasonably," while for a hearing held more than forty-eight hours after arrest, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance."  500 U.S. at 56-57.  Here, as the Warden notes, it is unclear whether Arnold received a hearing within forty-eight hours.  Doc. 29 at 25.  A first degree murder complaint was filed with the circuit court on August 2, the third day (and thus over forty-eight hours) after Arnold's arrest.  Doc. 30-14 at 8-9.  But that complaint carries what appears to be a judge's signature dated August 1, only two days after Arnold's arrest.  *Ibid*.  It is also unclear what justification, if any, the police might have offered for not bringing Arnold before a judge sooner.

Whether a violation occurred is immaterial, however.  Arnold does not allege merely that his counsel was ineffective for failing to spot a violation, but that she was ineffective for failing to *invoke* that violation as a ground for *suppressing* his confessions.  This was not deficient performance, because any such suppression motion would have been unlikely to succeed.  *See Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether."); *Edmonson v. Harrington*, 2013 WL 2178320, at *7-8 (N.D. Ill. May 20, 2013) (denying habeas relief on the ground that trial counsel's performance was adequate, despite his failure to seek suppression under *Gerstein*, because neither Supreme Court nor Illinois precedent entitled a defendant to suppression as a remedy for a *Gerstein* violation).

The motion Arnold proposes would not have succeeded because, even if Arnold had a viable claim that his *Gerstein* rights were violated, that violation would not have entitled him to suppress his confessions.  *Gerstein* and *McLaughlin* were class action lawsuits challenging local

governments' methods for verifying probable cause after warrantless arrests.  *See McLaughlin*, 500 U.S. at 47; *Gerstein*, 420 U.S. at 106-07.  They establish the right to a prompt judicial determination of probable cause as a prerequisite to prolonged detention.  *See McLaughlin*, 500 U.S. at 55 ("A State has no legitimate interest in detaining for extended periods individuals who have been arrested without probable cause."); *Gerstein*, 420 U.S. at 126 ("[T]he Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention ….").  But neither decision establishes a right to suppress statements obtained during any such detention at a criminal trial.  *See Edmonson*, 2013 WL 2178320, at *8 ("[T]he United States Supreme Court has never held that a defendant is entitled to the suppression of statements made after an alleged [*McLaughlin*]/*Gerstein* violation.").  And in Illinois, the law is now settled that a defendant whose confession has already been deemed voluntary, like Arnold, cannot suppress a confession on the sole ground that it was elicited while a *Gerstein* violation was underway.  *See People v. Willis*, 831 N.E.2d 531, 540, 542 (Ill. 2005) (holding that there was no reason to "exclud[e] a putatively voluntary confession in order to deter police from violating *Gerstein* and *McLaughlin*," and therefore that Illinois courts "faced with a *Gerstein/McLaughlin* violation [should] ask simply whether the confession was voluntary ….  If so, it is admissible.  If not, it is inadmissible.") (citation omitted).  Here, the trial court determined that Arnold's confessions were voluntary.  Doc. 30-17 at 135.

*Willis* was decided two years after Arnold's trial, but it made clear that it simply clarified existing law.  831 N.E.2d at 541 ("The great weight of Illinois authority rests with the State, and we refuse to depart from it."); *see People v. Dees*, 422 N.E.2d 616, 618 (Ill. 1981) ("Delay alone … has not heretofore been considered sufficient cause to penalize the prosecution to the extent of excluding confessions obtained during the period between arrest and appearance before

a judge ….").  It follows that any motion to suppress based on *Gerstein* and *McLaughlin* that Piemonte might have filed would not have succeeded, meaning that her failure to raise a *Gerstein* issue was not deficient performance, *see Knowles*, 556 U.S. at 127; *Carter*, 796 F.3d at 735; *Lambert*, 365 F.3d at 563-64; *Neeley*, 189 F.3d at 684; *Fish*, 34 F.3d at 495, and, in any event, could not have prejudiced Arnold, *see McNary*, 708 F.3d at 921.

### D.      Appellate Counsel's Failure to Argue Trial Counsel's Ineffectiveness

Arnold also argues that his appellate counsel was ineffective for failing to raise Piemonte's ineffectiveness and/or for compounding her errors by failing to raise the same substantive issues on appeal.  Doc. 14 at 8-9; Doc. 37 at 34.  But where, as here, trial counsel was not ineffective, it is not ineffective for appellate counsel to decline to argue that trial counsel was ineffective; nor is it ineffective for appellate counsel not to press the same claims that trial counsel did not press.  *See Carrion*, 835 F.3d at 778 ("[B]ecause we have concluded that Mr. Carrion's involuntary confession claim is without merit, we also reject his related claim of ineffective assistance [for failure to raise it on appeal]."); *Martin v. Evans*, 384 F.3d 848, 852 (7th Cir. 2004) ("The record establishes that counsel vigorously represented Martin's interests and set forth the best possible argument in light of the clear state of the law.  His appellate counsel's decision to refrain from attacking trial counsel's representation on this basis was not objectively unreasonable.  Moreover, because the underlying trial counsel claim is meritless, there is not reasonable probability that the outcome of the appeal would have been different had counsel raised the issue.") (citation omitted); *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

### E. Post-Conviction Counsel's Performance

Arnold also claims that his post-conviction counsel was ineffective. Doc. 14 at 10. But as Arnold now acknowledges, Doc. 37 at 3 n.2, the ineffectiveness of post-conviction counsel is not a permissible ground for relief. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during … State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *London v. Clements*, 600 F. App'x 462, 466 (7th Cir. 2015) ("[Section] 2254 bars relief on the basis of poor performance by counsel in 'postconviction proceedings.'"); *Johnson v. McBride*, 381 F.3d 587, 590 (7th Cir. 2004) ("Once trial and direct appeals have run their course … neither the sixth amendment nor federal law guarantees effective assistance of counsel for collateral proceedings, not even in a capital case.").

## II. Fourth Amendment Claim

Arnold's remaining claim—that the trial court erred in failing to suppress his statements as the product of an unlawful arrest without probable cause in violation of the Fourth Amendment, Doc. 14 at 7—requires only brief discussion. Arnold concedes that this claim is "likely barred" by *Stone v. Powell*, 428 U.S. 465 (1976). Doc. 37 at 2 n.1. He is correct. Because Arnold does not argue that the Illinois courts did not give him "an opportunity for full and fair litigation" of his Fourth Amendment claim, *Stone* holds that he "may not be granted federal habeas corpus relief" on that basis. *Stone*, 428 U.S. at 494; *see also Sutton v. Pfister*, 834 F.3d 816, 820 (7th Cir. 2016) ("[A] federal court generally cannot grant *habeas corpus* relief based on a state court's failure to suppress evidence collected in violation of the Fourth Amendment.") (citing *Stone*). Arnold argues that "*Stone* itself is unconstitutional" and that "the United States Supreme Court should overrule *Stone*." Doc. 37 at 2 n.1. But until and unless the

Supreme Court overrules *Stone*, this court must faithfully apply it. *See Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) ("[I]t is this Court's prerogative alone to overrule one of its precedents.") (alteration in original).

## Conclusion

Arnold's federal habeas petition is denied. Habeas Rule 11(a) provides that the district court "must issue or deny a certificate of appealability [('COA')] when it enters a final order adverse to the applicant." *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). Where, as here, this court has decided a petitioner's claims on the merits, the applicable standard is:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that … includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotation marks omitted); *see also Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014).

This court's denial of Arnold's habeas claims relies on settled precedents and principles. The application of those precedents and principles to those claims does not present difficult or close questions, and so this case does not meet the applicable standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

January 10, 2017

_____
United States District Judge